# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
August 4, 2015 Session

## ADRIANNE KISER v. STATE OF TENNESSEE

### Appeal from the Criminal Court for Shelby County
### No. 10-06737    John W. Campbell, Judge

---

### No. W2014-02429-CCA-R3-PC  -  Filed November 6, 2015

---

The petitioner, Adrianne Kiser, appeals the post-conviction court's denial of his petition for post-conviction relief from his convictions for two counts of attempted voluntary manslaughter and one count of employing a firearm during the commission of a dangerous felony.  On appeal, he asserts that: (1) the post-conviction court applied an incorrect standard in evaluating trial counsel's performance and the resulting prejudice, and (2) if the post-conviction court applied the correct standard, then the court's interpretation of that standard renders Tennessee Code Annotated section 40-30-106(e) and Tennessee Supreme Court Rule 13 section 5(a)(2) unconstitutional as applied to him. After review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which ROGER A. PAGE and ROBERT H. MONTGOMERY, JR., JJ., joined.

Valentine C. Darker, Memphis, Tennessee, for the appellant, Adrianne Kiser.

Herbert H. Slatery III, Attorney General and Reporter; Rachel E. Willis, Senior Counsel; Amy P. Weirich, District Attorney General; and Lessie Rainey, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The petitioner was convicted by a Shelby County Criminal Court jury of two counts of attempted voluntary manslaughter, employing a firearm during the commission of a dangerous felony, and reckless endangerment in connection with his shooting two

security guards at the Crystal Palace Skating Rink in Memphis. He was sentenced to four years for each of the attempted voluntary manslaughter convictions, to be served consecutively; six years for the employing a firearm conviction; and two years for the reckless endangerment conviction, for an effective term of sixteen years. The petitioner appealed, and this court reversed the reckless endangerment conviction, reducing the petitioner's sentence to fourteen years, and affirmed the remaining three convictions. State v. Andrianne Kiser, No. W2011-01937-CCA-R3-CD, 2012 WL 6115087, at *1, *14 (Tenn. Crim. App. Dec. 10, 2012), perm. app. denied (Tenn. May 7, 2013). The Tennessee Supreme Court denied his application for permission to appeal.

The underlying facts of the case were recited by this court on direct appeal as follows:

> In September 2010, the Shelby County Grand Jury indicted the [petitioner], Andrianne Kiser,[1] for two counts of attempted second degree murder as a result of his shooting Cedric Sawyer and David Secamond on April 2, 2010. The grand jury also indicted the [petitioner] for one count of employing a firearm during the commission of a dangerous felony and one count of reckless endangerment for endangering the lives of Erica Bays and Ciera Williams during the incident.

> At trial, Kevin Pilatt testified that in April 2010, he was working as a security officer at the Crystal Palace, a roller skating rink in Memphis. Pilatt explained that once a person entered the front doors of the building, a long hallway led to two ticket booths. The hallway and the ticket booths were separated from the skating rink area by a set of doors to the right of the ticket booths. On the night of April 2, 2010, a rap concert was scheduled to take place. However, the concert was canceled, and business at the skating rink was slow. About 9:00 p.m., Pilatt was about to go home when ten to twenty cars containing thirty to fifty people arrived in the parking lot. He said that at first, the people were "wrestling around" in the parking lot. Then they all went inside the building. Pilatt was walking behind the crowd and saw the crowd go into the skating rink area without stopping by the ticket booths to pay the admission fee. Pilatt's mother, the manager of the Crystal Palace, announced over the intercom that everyone needed to go to the ticket booths, but the crowd refused. Eventually, the security officers were able to get the crowd out of the skating rink area and back into the hallway. Pilatt said that everyone was "arguing and cussing

---

[1]The [petitioner]'s first name appears as "Andrianne" and "Adrianne" throughout the appellate record. However, we have referred to his first name as it appears in the indictment.

back and forth"; that someone in the crowd assaulted a security officer; and that everyone ran down the hallway, out the front doors, and into the parking lot. By the time Pilatt got to the front doors, shots were being fired in the parking lot. He heard two sets of shots and heard three to four shots during each set. Cedric Sawyer, a security officer standing next to Pilatt, was shot in the chest. Pilatt later found a bullet hole in his shirt under his left arm.

David Secamond[2] testified that on the night of April 2, 2010, he was working as a security officer at the Crystal Palace. There was not enough business to justify security officers being at the skating rink, and Secamond was about to leave when sixty to eighty people arrived. He said that everyone went inside the Crystal Palace, that someone held open the doors to the skating rink area, and that the crowd went into the area without paying. Security officers ushered the crowd into the hallway and pushed the crowd toward the front of the building. Everyone started exiting the building through the front doors, and Secamond heard gunshots in the parking lot. He was shot in the hip. He did not see the shooter and spent three days in The Med.

Cedric Sawyer testified that on the night of April 2, 2010, a rap performance was supposed to start at the Crystal Palace at 7:00 or 8:00 p.m. The rap group did not show up, and regular customers were skating. Sawyer was sitting in the parking lot about 10:00 or 10:30 p.m. when twenty or thirty people arrived and entered the building. Three people went to the ticket booths and paid the admission fee. Sawyer said that one of them opened the doors to the skating rink area and that the crowd "started bum rushing" through the doors. Security officers stopped the crowd, and the crowd began arguing with the officers. Sawyer said that someone hit one of the security officers in the eye and that everyone "stormed out" of the skating rink area and ran down the hallway toward the front of the building. When Sawyer got to the front doors, he heard two gunshots. He was shot in the chest and spent two weeks in The Med. He said that he did not see the shooter but that he saw the [petitioner] in the building on the night of the shootings. He said he had never seen the [petitioner] before April 2, 2010.

Andre Boyd testified that on the night of April 2, 2010, he worked as a security officer at the Crystal Palace. Boyd arrived for work about 9:45

[2]Although the witness's last name is spelled "Seccamond" in the trial transcript, we have spelled it as it appears in the indictment.

p.m.  About thirty minutes later, the security officers were informed that the manager could not afford to pay them for the night.  Boyd said that the manager bought them chicken dinners and that they "hung out . . . for a little while."  Fifty to sixty people arrived, and the officers had to get the crowd out of the skating rink area.  Boyd said that the crowd was "getting louder and cursing and wanted to fight" and that someone "threw a punch" at one of the officers.  The security officers forced the crowd into the hallway outside the skating rink area, and the crowd went into the parking lot.  Boyd was standing at the front doors when he heard five or six gunshots.  His roommate, David Secamond, was shot.  Boyd said that the crowd's altercation with the security officers was over "within a matter of minutes.  As quick as it started . . . it ended."

On cross-examination, Boyd testified that all of the gunshots came from the same direction.  He acknowledged that he testified at a previous hearing related to this case.  He said he did not remember stating at the hearing that two people were shooting.  However, he said it was possible he made that statement.  He also acknowledged saying at the hearing that some of the shots came from a nine millimeter gun and that the other shots came from a "thirty-eight."

Ciera Williams testified that on April 2, 2010, she and her family drove to Memphis to shop and go to the Crystal Palace.  Some of Williams's family members went inside the Crystal Palace to skate.  Williams did not go inside; she left the property to get something to eat.  She returned to the skating rink and was sitting outside in her car with her sister when six to ten cars arrived in the parking lot.  Twenty-five or thirty people got out of the cars and went inside the Crystal Palace.  Then all of the people came running outside.  Williams said that she saw a male standing "right in front" of her car and that he was shooting toward the building.  The shooter got into the driver's side of a red truck or SUV, the vehicle pulled away, and the shooter fired into the air.  Williams said the red vehicle was to the right of her car and was "probably like two car places away."  Williams said that when the crowd first arrived in the parking lot, she saw the shooter for about ten minutes, "play fighting around."  The State asked Williams if she saw the shooter in the courtroom.  Williams, referring to the [petitioner], stated, "Um, he kind of looks like him, because his ears point out, his ears stick up. . . .  He just, because his ears point up, he favors – that's what I remembered with his hat on, the pointed ears sticking out."  The State asked if the [petitioner] was the shooter, and Williams stated, "I am not sure."

4

On cross-examination, Williams testified that she arrived at the Crystal Palace about 10:30 p.m. She acknowledged that she testified at a previous hearing and that she was asked during the hearing to identify the shooter.

On redirect examination, Williams acknowledged that she identified the [petitioner] at the hearing as the shooter. The State asked Williams, "How are you feeling right now?" Williams answered, "Shaky," and the State requested a jury-out hearing. When Williams's redirect testimony resumed, she testified that was scared to testify against the [petitioner] because she had received telephone calls from a male "telling me not to show up in Court." She said that she received the first call near the end of 2010, that the call was from a "9-0-1 number," and that the male said he was calling for "A. D." The male knew the name of Williams's sister and knew that Williams lived in Clarksdale, Mississippi. Williams said that she received another telephone call "this past weekend" and that the call was again from a "9-0-1 number." The male said that his name was "Shaun" and that he was calling for "A. D." Williams said she was scared because the male knew her name, her telephone number, and the town in which she lived. She said he asked if he was speaking to Ciera, "the one who testified about the shooting." Williams lied to him by telling him that she was not Ciera and hung up. Williams identified the [petitioner] in court as the shooter. She acknowledged that she had trouble identifying the [petitioner] as the shooter on direct examination because she was afraid.

On recross-examination, Williams testified that on the night of April 2, 2010, the shooter was wearing a black "skull cap" and was about five feet, four inches tall. She said that after the [petitioner] shot toward the building, an SUV pulled up, and the [petitioner] "jumped" into the driver's side. She acknowledged testifying at the [petitioner]'s preliminary hearing that she only saw the side of the shooter's face. She also acknowledged that she told the police the gun was silver and was not a revolver.

Erica Bays, Ciera Williams's sister, testified that on the night of April 2, 2010, she and Williams were sitting in Williams's car while other family members were skating inside the Crystal Palace. At 10:30 p.m., about thirty teenagers arrived. Some of them were playing and wrestling in the parking lot. About fifteen minutes later, the teenagers went into the Crystal Palace. Bays saw everyone run outside. She said that the first person out of the building was standing in front of Williams's car and was

5

"firing back at the skating rink." The shooter was standing six to eight feet away from Bays. He ran to a red truck that had pulled up about two parking spaces away from Williams's car and fired gunshots into the air. He got into the back of the truck on the passenger side, and the truck drove away. Bays identified the [petitioner] at trial as the shooter and said he was one of the people she had seen wrestling earlier in the parking lot. She spoke with the police after the shooting, looked at a photograph array on April 6, 2010, and identified the [petitioner]'s photograph. Bays was asked to identify the shooter at the [petitioner]'s preliminary hearing, and she identified someone other than the [petitioner]. At trial, she explained, "I didn't pick out the right person, because I was nervous and scared[.]"

On cross-examination, Bays acknowledged that she gave a statement to police in which she described the shooter as "a little boy." She also acknowledged that she told the police the shooter was fifteen to twenty feet away from her when he fired the first set of shots and that he said "bitch" every time he fired. She acknowledged that she told the police the shooter was wearing a black shirt and a hat and that she described the hat as "probably like a baseball hat." At the [petitioner]'s preliminary hearing, Bays testified that she was trying to hide during the shooting. At trial, she said she was "sliding [down] in the seat" but could still see the [petitioner].

Officer Jason Matthews of the Memphis Police Department (MPD) testified that he responded to the shootings and was the first officer on the scene. One victim was lying inside the front door with a gunshot wound to his lower back or buttocks. Officer Matthews went inside and saw another victim with a wound to the center of his chest. Two females were sitting in a car in the parking lot.

Officer John Byars of the MPD testified that he investigated the shootings and developed the [petitioner] as a suspect. On April 6, 2010, he showed Erica Bays a photograph array. He said Bays identified the [petitioner] "[i]mmediately."

Officer David Payment of the MPD testified that he collected crime scene evidence after the shootings and found eight spent shell casings. The first casing was 90 feet away from the west wall of the Crystal Palace; the second casing was 92 feet, 8 inches away; the third casing was 90 feet, 6 inches away; and the fourth casing was 93 feet, 8 inches away. The first four casings were nine millimeter Luger spent casings. The fifth casing was 141 feet, 10 inches away from the west wall of the Crystal Palace; the

6

sixth casing was 181 feet, 6 inches away; the seventh casing was 180 feet away; and the eighth casing was 182 feet, 8 inches away. All of the casings in the second group were forty caliber Smith and Wesson spent casings. On cross-examination, Officer Payment acknowledged that he did not know how long the casings had been in the parking lot.

Twenty-four-year-old Dashaun "Shaun" Hobbs, the [petitioner]'s younger brother, was called as the State's last witness and acknowledged that he telephoned a witness in this case. He said that he telephoned the witness "about two weeks ago . . . or a week and a half or so[.]" He stated, "I just asked her was she coming, 'cause I didn't feel that he had committed the crime, or whatever." He said that the [petitioner] asked him to telephone the witness and that he did not know he was not supposed to contact witnesses in the case.

Dr. Jeffrey Neuschatz testified for the [petitioner] as an expert in eyewitness identification that he was an associate professor and the Chair of the Psychology Department at the University of Alabama in Huntsville. He said that he had reviewed police reports, witness statements, and the preliminary hearing testimony in this case and that he was testifying as a paid consultant for the defense. Dr. Neuschatz explained that when a person witnessed a complex event, the person did not remember the entire event. Instead, the person remembered fragments of the event and put the fragments together with other information. He said that the person could make inferences from events he or she had experienced that were similar to the event in question, that the person could collect information from "external sources," and that "they put all that together." He said that memory was "very fluent" and that a person's memory could change every time the person retold the story. A person could well-remember events the person had repeated or rehearsed, such as driving home, but events the person saw only one time were susceptible to "memory impairment." Witnessing a stressful event, such as a shooting, could impair a person's memory. He said that eyewitness identification accuracy also was much worse when the culprit was wearing a hat because the hat "cuts off some of the cues to the face." He said that seeing someone prior to the event could cause "unconscious transference," which occurred "when you mistakenly think someone who is at the scene was the person who committed the crime."

On cross-examination, Dr. Neuschatz acknowledged that he had not spoken to anyone involved with this case and that he was testifying based

upon studies and hypotheses. He also acknowledged that seeing a person for ten to fifteen minutes prior to the stressful event would help an eyewitness identify the person later.

On redirect examination, defense counsel showed Dr. Neuschatz a photograph of the crime scene. He described the scene as "dimly lit."

The jury convicted the [petitioner] of two counts of attempted voluntary manslaughter, a Class D felony, as a lesser-included offense of attempted second degree murder; one count of employing a firearm during the commission of a dangerous felony, a Class C felony; and one count of reckless endangerment, a Class E felony. After a sentencing hearing, the trial court sentenced him to consecutive sentences of four years for each attempted voluntary manslaughter conviction, six years for the employing a firearm conviction, and two years for the reckless endangerment conviction for a total effective sentence of sixteen years in confinement.

Id. at *1-6.

On January 13, 2014, the petitioner filed a *pro se* petition for post-conviction relief and, after the appointment of counsel, an amended petition was filed. In his petitions, the petitioner raised, among other things, several allegations of ineffective assistance of counsel. The post-conviction court conducted an evidentiary hearing at which counsel, a twenty-four-year veteran with the public defender's office, testified that she was appointed to represent the petitioner on his attempted second degree murder, employing a firearm, and reckless endangerment charges. Through discovery, she received a report about the incident prepared by Sergeant Brewer. In the report, Sergeant Brewer noted that Lieutenant Giles told him that two juvenile witnesses said that they saw someone firing a gun from a pink Lincoln. Counsel recalled asking her investigator to try to locate and speak with one of the juveniles, but she was not sure whether an interview was ever conducted. She noted that investigators are instructed to speak with the parents of a juvenile first. Counsel did not look for the other juvenile because it was indicated in Sergeant Brewer's report that the other juvenile "also mentioned the red SUV, which could ha[ve] implicated [the petitioner]."

Counsel testified that she spoke with the manager of the skating rink where the incident took place, who told her that the "troublemakers" were members of the rap group who were supposed to perform that night. Counsel developed a theory that it was someone other than the petitioner who committed the shooting. The officers' case notes that were provided to counsel in discovery reflected that when the pink Lincoln was pulled over later the night of the shooting, one of the rap artists, Lance "Boo Dirty"

8

Taylor, was driving the car. However, she did not develop a theory of defense based on Taylor's potential involvement, choosing instead to focus on a theory that the two eyewitnesses, Erica Bays and Ciera Williams, had misidentified the petitioner. Counsel maintained that her theory of defense was that "it wasn't [the petitioner]"; she just "explored more by misidentification as opposed to giving the jury someone else to think about."

Counsel testified that one of the witnesses, Erica Bays, identified the petitioner in a photographic array shown to her at her home, but she then identified someone other than the petitioner at the preliminary hearing and told the defense investigator that she was unsure she could recognize the petitioner. Counsel also had a defense expert witness, Dr. Neuschatz, who found that Bays's initial identification of the petitioner was "seriously problematic." Counsel did not file a motion to suppress the identification because it did not affect the admissibility of the identification but, rather, impacted the credibility of the witness and the weight the jury might attribute to the evidence.

Counsel testified that she used Dr. Neuschatz at trial as an expert in eyewitness identification. She questioned him using a list of questions that he sent to her, which were based on the areas he thought were pertinent to look into. Although Dr. Neuschatz told her that the initial identification done in Bays's home fell short of the recommended standards established by a psychological association, counsel was aware that there had been objections and questions raised in court concerning the standards for photographic arrays so she chose to "try and focus on the studies and . . . misidentification." Dr. Neuschatz did not give a conclusive opinion in his written report or on the stand as to whether Bays "couldn't [have] seen this."

Counsel admitted that she did not attempt to get fingerprint or DNA evidence from the shell casings collected at the scene, nor did she question the investigating officers about the lack of such evidence. However, she explained that she knew from previous trial work that such evidence rarely could be obtained because it "burn[ed] off when [the bullets] shot out." Counsel also said that the petitioner gave her the names of potential alibi witnesses, but the witnesses either refused to cooperate or could not provide "cogent" information that would support an alibi defense. Counsel agreed that she did not present any mitigation proof at the petitioner's sentencing hearing, other than to clarify the basis for his juvenile adjudication for a sexual offense. She did not investigate or present any evidence about the petitioner's "difficult childhood."

On cross-examination, counsel clarified that the police report about the juvenile witnesses who claimed to see someone shooting from a pink Lincoln noted that the officers concluded that the juveniles were not credible based on the physical proof and lack of corroboration from other witnesses at the scene. The report also documented that

the individuals in the pink Lincoln were released because there was no evidence to corroborate that they were involved in the shooting. Despite the report that the juveniles were not credible, counsel still made attempts to interview one of them. However, she did not think the other juvenile witness would be helpful because he had also said that he saw someone firing from a red vehicle like the one in which the petitioner was seen leaving from the skating rink.

Counsel testified that she met with Dr. Neuschatz before trial and reviewed his testimony. Together, they made strategic decisions about which parts of his report would be best received by the jury, deciding to emphasize the parts that talked about identification rather than the photographic array. She elaborated that, in previous trials, the State objected to expert testimony about photographic array guidelines promulgated by the American Psychological Association and not the Department of Justice, so she "was trying to have less objections to his testimony and focus more on the studies of memory and identification and how those play in together."

Counsel admitted, again, that she did not investigate the petitioner's background to gather mitigating evidence for the sentencing hearing, nor did he provide her with any such information. She said that, without knowing what the information would have been, she could not guarantee that she would have used it.

On redirect, counsel said that she did not take everything in a police report at face value. On recross-examination, counsel reiterated that her theory of defense was that there had been a misidentification by Ms. Bays and Ms. Williams, her preparation for trial was in line with that theory of defense, and the questions she asked Dr. Neuschatz were in an attempt to support her theory that the two witnesses were incorrect in their identification. She acknowledged, however, that information that someone was shooting out of a pink Lincoln could have supplemented her theory.

On examination by the court, counsel testified that the biggest problem confronting her in defending the petitioner was the two eyewitnesses who identified him. For that reason, she "got tunnel vision" and focused her efforts on trying to show that they misidentified the petitioner as the shooter.

Following the hearing, the court entered a written order denying post-conviction relief. The court found that the petitioner failed to prove that counsel's performance was below the standard of competence for attorneys practicing in criminal court or that the petitioner was prejudiced by any alleged deficiencies.

## ANALYSIS

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is de novo, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed de novo, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's

11

unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." Id. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

In denying the petition, the post-conviction court found:

Under Strickland, once a petitioner establishes that counsel fell below the standard of competence expected of a defense attorney, the second, performance, prong must be met showing that but for the failure of counsel to perform up to the standard of competence the outcome of the trial would have been different. . . .

In this case[,] trial counsel was given discovery by the State that indicated that there were two juvenile witnesses who gave information that could be helpful to the defense. Trial counsel did not talk to these individuals or at least had no information that these individuals had been interviewed by her investigator. Counsel was also in possession of information in the police report that questioned the credibility of these juvenile witnesses. Counsel testified that her strategy involved attacking the credibility of the testifying witnesses and using an expert to show the jury that eyewitness proof may not be reliable. Based on the proof before the Court, there has been no showing that trial counsel pursued a strategy that was below the standard of competence for attorneys practicing in criminal court. It might have been better had trial counsel interviewed the witnesses, but since no proof was offered to establish what these witnesses would have actually testified to[], or how credible their testimony would have been to the Court, the petitioner has not shown that the failure to use these witnesses resulted in prejudice to the petitioner. Trial counsel had a valid trial strategy and used an expert witness to convey to the jury potential doubt in the reliability of the eyewitnesses to make a[n] accurate identification. Petitioner has the burden to establish that these witnesses could have affected the outcome of the trial. The Court will not assume what is not in evidence.

Likewise, the allegation that trial counsel did not prepare and use the expert witness in an effective manner has not been proven by the petitioner.

The testimony of [counsel] indicated that she used an expert who had been called in these courts before and who had prepared questions for her to ask him on direct examination. He did not give an opinion on whether the identification of the eyewitnesses was reliable. Since he did not testify at the evidentiary hearing that he would have offered this testimony, the petitioner has not established that there was prejudice. The petitioner has not met his burden of proof to establish that counsel's conduct fell below the standard of competent counsel or that there was prejudice in how trial counsel handle[d] the testimony of Dr. Neuschatz.

In summary, the [p]etitioner has made allegations that trial counsel failed to provide effective assistance of counsel at trial. The petitioner alleges that certain witnesses were not called as witnesses who could have changed the outcome of the trial. The petitioner further alleges that trial counsel was ineffective for not properly preparing and using the expert witness hired to attack the identification made in this case. As stated above, the petitioner has not put on any proof to show that the failure to call witnesses or have the expert give an opinion about the identification in this case. For that reason, the Court finds that the petitioner has not met the burden of proof to meet the prejudice prong of Strickland. . . .

The petitioner first claims that the post-conviction court misconstrued the test set forth in Strickland in evaluating whether he received ineffective assistance of counsel. We simply do not agree with the petitioner's assertion that the post-conviction court applied the Strickland test incorrectly. Although the court committed a typographical error in its discussion of the law and summarized the law rather than directly quoting it, the analysis within the order indicates no miscomprehension of the law by the court.

Regardless, we cannot conclude that counsel rendered deficient performance or that any deficiency prejudiced the petitioner. The petitioner claims that counsel's performance was deficient because she failed to develop a second theory of defense based on the police report that two juvenile witnesses said they saw someone fire shots from a pink Lincoln and for failing to ask the expert witness to give an ultimate opinion about Ms. Bays's identification of the petitioner in a photographic array.

The reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462. Moreover, a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or

13

appropriate, but only what is constitutionally compelled.'" Burger v. Kemp, 483 U.S. 776, 794 (1987) (quoting United States v. Cronic, 466 U.S. 648, 665 n.38 (1984)).

Here, counsel's performance did not fall below the objective standard of reasonableness. Counsel testified that she focused on a clearly defined defense strategy of establishing that the two eyewitnesses had misidentified the petitioner as the shooter. She was aware that the police had interviewed two juveniles who claimed to have seen someone firing shots from a pink Lincoln, but she did not pursue an investigation of them because the police reported that the juveniles' accounts were not credible or reliable. Counsel also knew that the police had stopped the pink Lincoln and did not find any weapons when they searched it and its occupants. She did investigate the driver of the car, Lance Taylor, but ultimately decided to focus on "misidentification as opposed to giving the jury someone else to think about." Counsel also retained the services of an expert in eyewitness identification. She examined the expert at trial using a set of questions the expert prepared but avoided asking him questions she knew would elicit an objection from the State.

The petitioner's reliance on State v. Honeycutt, 54 S.W.3d 762 (Tenn. 2001), for the premise that counsel performed deficiently for failing to advance a second theory of defense does not entitle him to relief. Honeycutt involved a complete abandonment of a defense theory supported by credible evidence that a different person had committed the crime. Here, counsel developed a valid theory of defense and made strategic decisions in how to advance that theory. Counsel's performance was constitutionally adequate. See Claude F. Garrett v. State, No. M2011-00333-CCA-R3-PC, 2012 WL 3834898, at *22 (Tenn. Crim. App. Sept. 5, 2012), perm. app. denied (Tenn. Feb. 25, 2013) (noting that "[t]he [p]etitioner essentially complains that trial counsel did not use every bit of evidence at his disposal to discredit the State's theory. We do not read Honeycutt to impose such a standard.").

Moreover, the petitioner failed to establish prejudice due to counsel's failure to interview the two juvenile witnesses in order to use them to establish a second theory of defense at trial, or to ask Dr. Neuschatz for his ultimate opinion of Erica Bays's photographic identification. In order to succeed on a claim that counsel did not properly investigate or call favorable witnesses at trial, a petitioner must generally elicit favorable testimony from those witnesses at the evidentiary hearing, as a post-conviction court may not speculate "on the question of . . . what a witness's testimony might have been if introduced" at trial. Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). The petitioner has not shown a "probability sufficient to undermine confidence in the outcome" that the result of the outcome would have been different had the jury heard the testimony he says should have been presented. See Strickland, 466 U.S. at 694.

14

The petitioner asserts that there were other ways in which counsel rendered ineffective assistance that were not addressed by the post-conviction court: counsel failed to (1) properly investigate evidence of culpability of other parties; (2) develop and articulate a cogent theory of defense; (3) file the necessary pretrial motions; (4) properly argue a critical evidentiary issue; (5) ask the defense expert for an opinion; (6) use the defense expert's analysis of the numerous identifications made in the case; (7) properly challenge the testimony of State witnesses; (8) properly challenge improper questioning and statements by the State; (9) request scientific testing; (10) develop relevant legal arguments in closing; and (11) present any mitigation evidence at sentencing.

The post-conviction court's order shows that the court adequately addressed the petitioner's claims that counsel failed to properly investigate evidence of culpability of other parties, develop and articulate a cogent theory of defense, ask the defense expert for an opinion, and use the defense expert's analysis of the numerous identifications made in the case. The court found that trial counsel had "a valid trial strategy" and that "there was no showing that trial counsel pursued a strategy that was below the standard of competence for attorneys practicing in criminal court." The court also found that "the allegation that trial counsel did not prepare and use the expert witness in an effective manner has not been proven by the petitioner" and that the petitioner failed to establish "that the failure to call the witnesses or have the expert give an opinion about the identification" caused him prejudice. The record supports the court's determinations.

The record shows that the petitioner did not present proof with regard to his claims that counsel failed to file the necessary pretrial motions, properly argue a critical evidentiary issue, properly challenge the testimony of State witnesses, challenge improper questioning and statements by the State, request scientific testing, and develop relevant legal arguments in closing. Therefore, the petitioner failed to prove those grounds by clear and convincing evidence.

As to the petitioner's claim that the post-conviction court failed to address whether counsel rendered ineffective assistance by failing to present any mitigation evidence at sentencing, we see no reasonable probability that the outcome of the sentencing hearing would have been different had counsel presented mitigating evidence. The petitioner did not offer proof to substantiate what mitigating evidence should have been presented, and some evidence of the petitioner's history was considered by the trial court as part of the petitioner's presentence report.

The petitioner lastly claims that, if this court determines that the post-conviction court applied the correct standard, that the absence of certain witnesses from the evidentiary hearing was "dispositive of the prejudice issue," then the post-conviction court's interpretation of that standard renders Tennessee Code Annotated section 40-30-

15

106(e) and Tennessee Supreme Court Rule 13, section 5(a)(2) unconstitutional as applied to him. Tennessee Code Annotated section 40-30-106(e) and Tennessee Supreme Court Rule 13, section 5(a)(2) prohibit funding for expert or investigative services in non-capital post-conviction proceedings. The petitioner claims, therefore, that his rights to equal protection and due process were violated because it was "impossible for [him] to prevail without at least hiring an investigator and perhaps even an expert" in order to present witnesses at his post-conviction hearing that would establish prejudice. However, the Tennessee Supreme Court has specifically held that the "[S]tate is not required to provide expert assistance to indigent non-capital post-conviction petitioners," and that the due process rights of non-capital post-conviction petitioners were sufficiently protected. Davis v. State, 912 S.W.2d 689, 696 (Tenn. 1995). Moreover, this court has previously considered and rejected the argument that the denial of funds violates due process and equal protection. See Johnny Rutherford v. State, No. E1999-00932-CCA-R3-PC, 2000 WL 246411, at *17-18 (Tenn. Crim. App. Mar. 6, 2000), perm. app. denied (Tenn. Sept. 18, 2000) ("Neither due process nor equal protection requires the state 'to provide expert services to indigent non-capital post-conviction petitioners.'") (quoting Davis, 912 S.W.2d at 696-97)); see also Kevin Jones v. State, No. W2009-02051-CCA-R3-PC, 2010 WL 4812773, at *4 (Tenn. Crim. App. Nov. 19, 2010), perm. app. denied (Tenn. Apr. 12, 2011).

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the denial of the petition.

_____
ALAN E. GLENN, JUDGE

16